UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | ) Civil Action No. _____ |
| v. | )<br>) JURY TRIAL DEMANDED |
| BERNARD FINDLEY and HALITRON, INC., | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission" or "SEC"), for its complaint against Defendants, Bernard Findley ("Findley") and Halitron, Inc. ("Halitron"), hereby alleges as follows:

## SUMMARY

1. Between 2016 and 2018, Halitron and Findley defrauded investors by disseminating false and misleading press releases about Halitron, a business Findley owned and controlled. In an effort to attract investment in the company, Findley grossly exaggerated Halitron's financial wherewithal, the value of its assets, and its prospects.

2. Halitron and Findley disseminated these false and misleading press releases between 2016 and 2018 in an attempt to prop up the value of Halitron's stock and, in turn, to attract entities ("financiers") who provided funding to Halitron in exchange for discounted shares of Halitron stock. As a result, even though Halitron had scant operations, it was still able to raise funds. For instance, in 2017, the year Halitron all but ceased operations, Halitron and Findley raised nearly half a million dollars. Instead of funding the company's operations, however, Findley used the money Halitron received from the financiers mainly to pay himself, to cover his

wife's credit card bills, and to pay stock promotion fees. In short, Findley squeezed money out of Halitron, for his own benefit at the expense of investors whom he misled about the health of Halitron's business.

3. As a result of the conduct alleged herein, Defendants have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 340.10b-5].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

4. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. 78u(d)].

5. The Commission seeks a permanent injunctions against Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. The Commission further seeks to prohibit Findley from acting as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit Findley from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, and transactions and courses of business alleged in this Complaint occurred within the District of Connecticut and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.

## DEFENDANTS

8. **Halitron, Inc.** is a Nevada corporation with its principal place of business in Newtown, Connecticut. Halitron is a self-described "equity holding company" controlled and operated by Findley. At all relevant times, Findley was Halitron's only officer and director, and its only fulltime employee. Halitron purports to own various companies in the business of supplying display signs for businesses and scrapbooking material and services for individuals, but since at least 2017 has had no significant operations or revenue. Halitron's common stock is quoted and traded on the OTC Link (formerly "Pink Sheets") operated by OTC Markets Group, Inc. ("OTC Markets") under the symbol "HAON."

9. **Bernard Findley**, age 47, is a resident of Newtown, Connecticut. Findley has been the Chairman and Chief Executive Officer of Halitron since at least 2014.

## RELATED PARTIES

10. **Company X** is a Nevada corporation with its principal place of business in Newtown, Connecticut. Company X purports to be a social media company that is also in the

business of online data storage. The company's services never went live and the company never had any revenue. Company X was owned and controlled by Findley and another individual until early 2018, when the two severed their business relationship. Company X's common stock is quoted and traded on the OTC Link operated by OTC Markets.

## FACTS

11.     In 2016, Halitron's business records purport to show that it had approximately $300,000 in revenue. In 2017, however, the company stopped generating any revenue. Around the same time, Findley increased his efforts to raise money on behalf of Halitron, often to pay himself and to pay his personal expenses.

12.     The majority of Halitron's financial activities since 2017 involved transactions with financiers that bought Halitron's purported debts in exchange for discounted Halitron stock. This allowed Halitron to reduce its purported debt obligations and receive cash. The financiers then sold the discounted Halitron shares into the public securities markets at a higher share price.

13.     To facilitate these debt financing transactions, Halitron and Findley set out to make Halitron's stock appealing to the financiers by making it easier for them to sell the stock into the public securities markets at higher share prices. In an attempt to create and increase liquidity for Halitron stock, Halitron and Findley continued to promote Halitron's stock even as the company's operations and revenue dwindled. Between 2016 and 2018, the company took in about $555,000 from debt financing transactions, of which Findley funneled over half to himself by transfers into his personal bank account and payments towards his wife's credit card debt.

14.     While in control of Halitron, Findley wrote and published numerous press releases that contained false and/or misleading information about the company's finances and operations. The press releases included grossly inaccurate and, in some instances, wholly

fabricated, information. The press releases were broadly disseminated to investors through Halitron's website, the media, and at least one paid stock promoter. Individually and collectively, the press releases created the impression that Halitron had the aspiration and ability to grow its operations and revenue. In fact, the company had little to no operations, had no fulltime employees, had virtually no revenue, and had no immediate prospects.

15. Each of the false and misleading statements detailed below was material as each created the impression that Halitron was an operating business with value and future prospects, when in fact it had neither. A reasonable investor would certainly find it important to know that Halitron and Findley were grossly misrepresenting the extent of the company's financial wherewithal, operations, and future prospects when making a decision to invest in Halitron.

16. Defendants' false and misleading public statements about Halitron fell into four categories:

### *Defendants' False and Misleading Statements about Halitron's Financing.*

17. On July 7, 2016, Halitron and Findley disseminated a press release stating that Halitron had finalized plans for a $300,000 debt financing (meaning Halitron would receive a loan of $300,000) at an interest rate of 6% per year (meaning Halitron would pay 6% interest to the lender) so long as certain stock price milestones were met in the fiscal quarter ending September 30, 2016. The press release further stated that the company planned to use the funding "to accelerate sales and jump-start the factory" to achieve the goal of "$3 - $5 million in sales" for 2016.

18. The July 7, 2016 press release omitted that the actual term of the note stated that the total sum was "*up to* $300,000" (emphasis added) rather than a guarantee to the full $300,000, and that funding was not guaranteed but was "at the sole discretion" of the lender even

if those stock price milestones were achieved. The press release also understated the actual interest rate that Halitron would pay on the loan, which was 8%, not 6%. In fact, the lender ended up only providing Halitron with funding of $20,000, a tiny fraction of the amount boasted in the press release. The press release therefore misstated both the terms and size of the financing, and created a false impression as to the Halitron's financial wherewithal and future prospects. Neither Halitron nor Findley ever issued a public statement correcting these false and misleading statements.

### *Defendants' False and Misleading Statements about Halitron's Financial Audit.*

19. In late 2016, Findley engaged an accounting firm to audit Halitron's financial statements. In May 2017, Halitron announced publicly that its audit was near completion and that the company planned to become an SEC reporting public company. Later, Halitron announced that instead of becoming an SEC reporting company, it would seek to list its stock on a higher-tiered service on OTC Markets when the audit was completed.

20. On December 11, 2017, Halitron and Findley disseminated a press release stating that Halitron's financial audit was still underway. In reality, around the time of this release, Halitron had abandoned the endeavor, partly due to its inability to pay the auditor and partly due to the poor condition of Halitron's financial records. No audit was completed in 2017.

21. In 2018, Halitron and Findley continued to mislead investors about Halitron's purported audit. In a press release dated January 16, 2018, Halitron and Findley stated that Halitron was "completing the audit." A month and half later on February 28, 2018, Halitron and Findley disseminated another press release stating that an audit would "commence quickly." In reality, the audit efforts had already been abandoned in late 2017, as Findley had stopped communicating with Halitron's auditor. No further audit work was conducted or completed in

2018. Yet, Halitron and Findley issued an April 25, 2018 press release again falsely stating that the company was in the process of finalizing its financial audit. Therefore, the various press releases concerning Halitron's financial audit were false and misleading.

### *Defendants' False and Misleading Statements Concerning Halitron's Stock Buyback Program.*

22.     In 2017 and 2018, Halitron and Findley promoted Halitron's stock by claiming that Halitron planned to implement a stock buyback plan to reacquire stock from its shareholders. On October 30, 2017, Halitron and Findley disseminated a press release stating that Halitron's management and board of directors had agreed to allow the company to engage in a stock buyback program to "increase shareholder value[.]" In his position as the sole board member and officer of Halitron, Findley had not created any plan for a stock buyback program. Halitron's April 25, 2018 press release regurgitated the misrepresentation about a stock buyback program, and Halitron did not repurchase any significant amount of stock from its shareholders at or near the time of the press releases. The press releases were therefore false and misleading insofar as they created the false impression that Halitron had a plan for, or was engaged in, a stock buyback program for the benefit of investors.

### *Defendants' False and Misleading Statements about Halitron's Assets.*

23.     While Halitron's business operations dwindled, Halitron and Findley made false and misleading statements concerning the value of company assets. On July 18, 2017, Halitron and Findley issued a press release concerning an anticipated stock transaction with Company X, a company Findley partially owned and over which he exerted control at all times Halitron issued press releases about Company X. Halitron and Findley represented that the stock transaction involved Company X purchasing a purported asset from Halitron in exchange for

Company X stock. The press release stated that the transaction was valued at more than $3 million.

24. The July 18, 2017 press release grossly inflated the value of the purported deal, which involved no valuable assets and could not support a valuation anywhere near the $3 million that Halitron and Findley claimed in the press release. Further, at the time of the press release, Findley knew, or was reckless in not knowing, that Company X was a new company with no revenue and very little funding. Company X stock, therefore, could not support the $3 million deal valuation Halitron and Findley touted.

25. On December 4, 2017, Halitron and Findley disseminated a press release again highlighting Halitron's purported ownership of $3 million in Company X stock. According to the press release, aside from this purported interest in a fledgling company Findley also controlled, Halitron's other assets were unspecified "goodwill" associated with the other companies that Halitron purportedly owned. Findley, without any explanation, estimated the "goodwill" to be worth $1.4 million. Indeed, some of the companies Findley referenced barely had any operations at the time and Halitron did not even own one of them. In any event, none had sufficient operations to support Halitron and Findley's purported valuation.

26. About two weeks later, on December 14, 2017, Halitron and Findley disseminated a press release again boasting about Halitron's ownership of Company X stock, and representing that this purported ownership interest entitled Halitron to a dividend payment of $3 million in 2020. The release further stated that once Halitron received the $3 million payment, Halitron planned to pay a cash dividend to its shareholders. At the time of the release, Findley was still a co-owner and the "chairman" of Company X and therefore knew, or was reckless in not

knowing, that Company X, a company with no revenue and extremely limited operations, had no plans (and no financial ability) or reasonable prospect to make such a payment.

27.     The misstatements concerning Halitron's purported $3 million interest in Company X continued into 2018.  On January 22, 2018, Halitron and Findley disseminated a press release stating that Halitron had received a $3 million promissory note from Company X with an interest rate of 4% (meaning Company X owed $3 million to Halitron and would pay 4% interest to Halitron on this debt).  The press release omitted that Findley had executed the note in question as the agent for both companies without the knowledge and consent of Company X's other owner, and that, as a result, Company X disputes the validity of the note.  Further, as Findley knew or was reckless in not knowing, at the time, Company X had virtually no operations and no prospects of raising money to pay Halitron such a large sum of money.

### First Claim for Relief

**FRAUD IN THE OFFER OR SALE OF SECURITIES AGAINST THE DEFENDANTS**
**(Violations of Section 17(a) of the Securities Act)**

Paragraphs 1 through 27 are re-alleged and incorporated by reference.

28.     By reason of the conduct described above, Defendants, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting knowingly, recklessly, or, as to (ii) and (iii), negligently (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

29. By reason of the conduct described above, Defendants violated Securities Act Sections 17(a) [15 U.S.C. § 77q(a)].

### Second Claim for Relief

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES AGAINST THE DEFENDANTS**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

Paragraphs 1 through 29 are re-alleged and incorporated by reference.

30. By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

31. By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

A. Permanently restraining and enjoining the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.    Ordering the Defendants pay disgorgement plus prejudgment interest of all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

C.    Ordering the Defendants to each pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.    Enter an order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Findley from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section12 of the Exchange Act [ 15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

E.    Enter an Order prohibiting Findley from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

F.    Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter.

DATED:  March 25, 2020.

>Respectfully submitted,
>
>**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
>
>By its attorneys,
>
>*/s/ Alfred A. Day*
>Alfred A. Day (Mass. BBO No. 654436)
>Xinyue Angela Lin (Mass. BBO No. 672786)
>Martin F. Healey (Mass. BBO No. 227550)
>Boston Regional Office
>33 Arch Street, 24th Floor
>Boston, Massachusetts  02110
>(617) 573-8900 (Main)
>(617) 573-4590 (Facsimile)
>daya@ sec.gov (Day)
>linxa@sec.gov (Lin)
>healym@sec.gov (Healey)
>
>Local Counsel:
>
>John B. Hughes (Fed. Bar No. CT 05289)
>Assistant United States Attorney
>Chief, Civil Division
>United States Attorney's Office
>Connecticut Financial Center
>157 Church Street, 23rd Floor
>New Haven, CT 06510
>(203) 821-3700
>(203) 773-5373 (Facsimile)