## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>　　　Plaintiff,<br><br>　　　v.<br><br>BERNARD FINDLEY and HALITRON, INC.,<br>　　　Defendants. | No. 3:20-cv-0397 (SRU) |

### <u>MEMORANDUM OF DECISION AND PERMANENT INJUNCTION ORDER</u>

Defendant Bernard Findley is the Chairman and CEO (and sole officer and director) of Defendant Halitron, Inc., an equity holding company based in Connecticut. In 2020, the Securities and Exchange Commission ("SEC") charged Findley and Halitron (collectively "defendants") with violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. After a trial in January 2023, a jury found the defendants liable for publishing press releases containing fraudulent misrepresentations about the status of Halitron's financial audit, a stock buyback program, and a $3 million promissory note from Life's Time Capsule ("LTCP").

Before the Court now is the SEC's motion for entry of final judgment, doc. no. 146, requesting that the Court impose remedies against Defendants Findley and Halitron, Inc. in the form of disgorgement, a civil penalty, permanent injunctions against both defendants, and permanent officer and director and penny stock bars against Findley.

### I.　　Findings of Fact

The parties agree that I may make independent findings of fact that are consistent with the jury's verdict in support of its decision on appropriate remedial sanctions.

I find the following facts:

A. <u>The Jury Found That The Defendants Made Two Categories of False and Misleading Statements with Scienter, and a Third Negligently.</u>

The Commission's complaint charged Findley and Halitron with violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act arising out of a series of press releases about Halitron's business and prospects. *See generally* Doc. No. 1. After a seven-day trial, the jury found Findley and Halitron liable for fraudulent misrepresentations about the status of Halitron's financial audit (seven press releases) and its stock buyback program (six press releases) (in violation of Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder) and about a $3 million promissory note from Life's Time Capsule ("LTCP") (in violation of Securities Act Section 17(a)(2)).  Doc. No. 133.

The jury was instructed that, to find Findley liable for fraudulent misrepresentations, it had to unanimously find that Findley acted with scienter—*i.e.*, an intent to mislead or a high degree of recklessness—for Section 10(b) of the Exchange Act, and, with respect to Securities Act Section 17(a)(2), at least negligently.  Doc. No. 132.  The jury found that Findley acted with scienter with respect to the statements about the audit and the buyback. Doc. No. 133.  However, the jury was not asked to determine on a statement-by-statement basis which of the seven audit press releases and six stock buyback press releases were false and misleading.[1]  As set forth in the following section, I find that each of Findley's statements about the audit and stock buyback was false and misleading and made with scienter.

---

[1] Because the jury found that Findley acted negligently with respect to a single press release concerning a purported $3 million promissory note, I need not engage in a statement-by-statement analysis for that press release.

B.  <u>Findley's Fraudulent Conduct Spanned the Period from May 2017 through April 2018</u>

     i.  *Each of the Six Press Releases Concerning the Stock Buyback Program Was Misleading*

Between October 30, 2017 and April 25, 2018, Halitron issued six press releases concerning a stock buyback program.  Trial Exs. 514, 516, 522-525.  Findley authored and had the final say on all six press releases.  Trial Tr. 77:14-19; 176:22-24.  All the press releases concerning the stock buyback program effectively said the same thing—that Halitron was engaged in a program to buy back Halitron shares in the open market.  *See* Trial Ex. 514, Oct. 30, 2017 ("engaging in a stock buyback program"); Trial Ex. 516, Nov. 10, 2017 ("[positive cash flow] will be utilized to buy back shares"); Trial Ex. 522, Jan. 22, 2018 ("Halitron has begun to buy back shares"); Trial Ex. 523, Feb. 6, 2018 ("the Company will continue to buy back shares"); Ex. 524, Feb. 28, 2018 ("Management has begun to and is committed to acquiring additional shares"); Trial Ex. 525, April 25, 2018 ("currently engaged in a share buyback program").  The purpose of the stock buyback program was to increase shareholder value (Trial Tr. 83:21-25), and four of the six press releases concerning the buyback specifically stated as much.  *See* Trial Ex. 514, Oct. 30, 2017 ("increase shareholder value by engaging in a stock buyback program"); Trial Ex. 522, Jan. 22, 2018 ("Halitron has begun to buy back shares . . . with the objective to increase its share price"); Trial Ex. 524, Feb. 28, 2018 ("acquiring additional shares back . . . to help support an increase in share price"); Trial Ex. 525, April 25, 2018 ("currently engaged in a share buyback program to help support increased share price").

Ultimately, Halitron bought back shares on only four occasions—in December 2017, January 2018, and June and July 2018—and spent only $3,500 to buy back less than 15 million shares—"an extremely small percentage" of the number of shares outstanding.  *See* Trial Ex. 129; Trial Tr. 94:25-95:5, 98:21-22 (Findley).  However, none of the six press releases disclosed the number of shares Halitron bought back or the small dollar amount Halitron spent on the buyback.

*See* Trial Exs. 514, 516, 522-525; Trial Tr. 88-91.

During the same period that Halitron was touting a stock buyback program to increase shareholder value, October 2017 to April 2018, Halitron was issuing billions of discounted shares to various debt financiers.  *See* Trial Ex. 129; Trial Tr. 95:6-12.  Findley acknowledged at trial that issuing shares in those amounts dilutes Halitron's stock—that is, by increasing the number of shares outstanding, it makes each share less valuable.  Trial Tr. 100:4- 103:10; Trial Ex. 557 (2016 email from Findley saying "On the pink sheets, you could destroy a company value by releasing too many shares at once.")  Further, Halitron's outside counsel specifically warned against the very claim—that the purported buyback program would increase shareholder value— that Findley repeatedly included in press releases:  "Can't say you'll drive or increase shareholder value (meaning the share price would increase) as the [debt financing transaction] is dilutive and will decrease shareholder value by its very nature."  Trial Ex. 597 at 1. Findley thus knew and was on notice from his counsel that his claims about the stock buyback were misleading.

Nevertheless, none of the six press releases concerning the stock buyback program disclosed the billions of discounted shares issued to debt financiers or even that any shares were issued at all.  *See* Trial Exs. 128, 514, 516, 522-525; Trial Tr. 97:16-19.

> ii.   *Each of the Seven Press Releases Concerning the Audit Was False or Misleading*

Between May 12, 2017 and April 25, 2018, Halitron issued seven press releases concerning a financial audit of Halitron by auditing firm Friedman LLP.  Trial Exs. 509-511, 518, 522, 524, 525.  Findley authored and had the final say on all seven press releases.  Trial Tr. 176:22-24.

Halitron's May 12, 2017 press release claimed the audit would be completed in "May-June 2017," even though Findley knew that (a) Friedman had not started substantive work on the audit as of May 16, 2017, (b) the project was substantial, requiring the preparation of nine years

of audited financials, and (c) the auditors thought Halitron's financial records were in poor

condition for conducting an audit.  *See* Trial Exs. 105, 509, 618 (Findley email to Van Fleet

saying "[n]o audit work performed through May 16, 2017"); Trial Tr. 156:2-12, 429:11-22,

419:9-12, 430, 431.  At no point did Justin Van Fleet, the lead partner on the Halitron audit, tell

Findley that Friedman would be done with Halitron's audit by June 2017, that the audit was

close to being done, or commit to any timeline for completing the audit.  Trial Tr. at 432:23,

435:18-20, 461:20-25. Nevertheless, Halitron's May 2017 press release did not mention the poor

condition of Halitron's records or that Friedman never agreed to complete the audit by June

2017.  *See* Trial Ex. 509.

On June 22, 2017, Friedman sent Findley a long list of open items needed for the audit to

proceed.  Trial Ex. 113, Trial Tr. 443.  Findley never asked Friedman how long the open items

list would take to close out or if Friedman had all the documents it needed from Halitron to close

out that long list.  Trial Tr. 159-160.  Nothing about the list of open items suggested the audit

was close to being done.  Trial Ex. 113, Trial Tr. 443.  Accordingly, on June 29, 2017, Findley

emailed Friedman that he was "very concerned about the timing of the [audit] project." Again,

on July 7, 2017, Findley sent an email saying there was "no end in sight" to the audit. Trial Exs.

593, 618.  Nevertheless, eleven days later, on July 18, 2017, Halitron issued a press release

saying, "Management anticipates completing the audit shortly," followed by another press

release, on July 24, 2017, claiming the auditing process was "almost complete."  Trial Exs. 510,

511.  As of the end of July 2017, the auditing process was not close to completion, and Van Fleet

never represented to Findley that it was.  Trial Tr. 448:12-17.  The July press releases concerning

the audit did not disclose that there was a long list of open items still required by Friedman to

proceed with the audit or that Halitron's "management" (*i.e.*, Findley) was "very concerned"

about the status of the audit and believed there was "no end in sight."  *See* Trial Exs. 593, 618.

Halitron next issued a press release concerning the audit on Dec. 11, 2017, saying "Management expects the 2017 audit to be completed during the early part of 2018[.]" Trial Ex. 518.  Van Fleet never told Findley that Halitron's audit would be completed by the first part of 2018.  Trial Tr. 457:1-9.  In actuality, the auditors had stopped work on Halitron's audit two months before, in October, not having completed the audited financials for any year, and Bruce Harmon, the person responsible for facilitating the audit on Halitron's end, had ceased doing work for Halitron in approximately November 2017.  Trial Tr. 167-168; 173:15-17; 422-423; 456:10-12, 462:4-6.  Ultimately, Friedman did not do any work on the 2017 audited financials and never completed the audited financials for any year.  Trial Tr. 457:16-18, 458:7-9, 462:1-10.  The December 11, 2017 press release did not disclose that Friedman had stopped work on the audit two months before, that no year of audited financials had been completed, or that the person responsible for facilitating the audit on Halitron's end (Harmon) had ceased work the month before.  *See* Trial Ex. 518.

Even though Friedman stopped work on the Halitron audit in October 2017 and the last substantive communication between Friedman and Halitron about the audit was in November 2017, Halitron announced on January 22, 2018 that the "audit work is under way and is expected to complete in the first half of 2018[.]"  *See* Trial Ex. 522; Trial Tr. 456:10-12; 461:10-15. No audit work was underway as of January 2018 and Van Fleet never represented to Findley that the audit would be completed in the first half of 2018.  Trial Tr. 460:1-14.  The January 22, 2018 press release did not disclose that Friedman had stopped work on Halitron's audit three months before or that Friedman had not agreed to complete the audit in the first half of 2018.  *See* Trial Ex. 522.

On February 28, 2018, Halitron again issued a press release about the audit, saying a "US GAAP audit … will commence quickly[.]"  Trial Ex. 524.  As before, this press release did not

disclose that Friedman had stopped work on Halitron's audit nearly four months earlier or that there had been no substantive communications between Halitron and Friedman for nearly three months. *See* Trial Ex. 524; Trial Tr. 456:10-12; 461:10-15.

On April 25, 2018, Halitron announced it had "re-engaged Freidman LLP to complete the 2017 audit [and Friedman] will continue to finalize the project through September 30, 2017 over the coming months[.]" Trial Ex. 525. Friedman, however, was not doing any work for Halitron in April 2018, much less was it finalizing any audit work. Indeed, Friedman had not done any work on the Halitron audit for nearly six months and had had no substantive communications with Halitron about the audit for nearly five months. Trial Tr. 456:10-12, 461:7-9, 461:10-15. None of those facts were disclosed in the April 2018 press release. *See* Trial Ex. 525. Notwithstanding the audit never being completed and Friedman ceasing work on the project, at no point did Findley or Halitron issue any corrective statements about the audit.

C. The Defendants Engaged in a Pattern of Fraudulent Conduct to Spur Investor Interest, and In Turn To Attract Debt Financing Money for Themselves.

As set forth above, I find that Findley made 14 fraudulent misrepresentations (13 with scienter and one negligently) over the course of a year. *See* Section I.(A), (B) above. That pattern of issuing recurring, false and misleading press releases on the same subjects was designed to create investor demand for Halitron's stock. Trial Tr. 179:16-20 (Findley).

Findley paid stock promoters, like Charles Tamburello and his company Global Discovery, to tout Halitron's stock to spur further investor demand. Trial Exs. 132, 810 (Global Discovery consulting agreement); Trial Tr. 73:5-77:13. Those stock promotion activities achieved their goal:

> Q. He [Tamburello] writes, "Hi Bernard, the stock saw about $625,000 in trading volume." Do you see that?
>
> A. Yes.
>
> Q. And "I estimate about $400,000 was new money in." Do you see that?

A. Yes.

Q. So Mr. Tamburello is telling you that as a result of marketing activities, there was $625,000 of trading in [Halitron stock], right?

A. Yes.

Q. And about 400,000 of that was new money, meaning new investors, right?

A. Correct.

Trial Tr. 77:4-13 (Findley) (referencing Trial Ex. 634).

Indeed, there was a marked increase in trading volume for Halitron's stock over the entire duration of Findley's fraud:



Exhibit A (Noone decl.), Appendix A.

Not only was there a marked increase in trading volume over the entire course of the fraud, there were significant spikes in trading around the time of a number of the press releases at issue. For example:

> o  On October 27, 2017, the last trading day before the October 30, 2017 press release, the volume of trading was 66,069,391. Trading spiked to 2,112,652,000 the day the press release issued and stayed at 1,009,303,000 the

following day.

o  On December 8, 2017, trading volume was 56,290,000.  Then, on the next
   trading day, December 11, 2017, another press release issued, and trading
   spiked to 869,394,188.

o  On April 24, 2018, trading volume was 41,349,992.  When the April 25, 2018
   press release issued, trading spiked to 1,039,214,000 before receding to
   119,147,102 the following day.

Exhibit A (Noone decl.), Appendix A.  Those are examples.  As set forth in the table

accompanying Mr. Noone's declaration, trading volume spiked the day of or the day after seven of

the ten days that fraudulent press releases were issued.  *Id*.

Increased demand for Halitron's stock was necessary to attract debt financiers that would

provide funding to Halitron in exchange for deeply discounted Halitron shares they could sell at a

profit.  Trial Tr. at 69-70 (Findley) (describing debt financiers receiving discounted shares to

satisfy debt), 179-180 (Findley) (debt financing lenders would not lend unless there is investor

demand to buy discounted shares).  Findley admitted as much:

Q: Well, we talked about earlier how the press releases and other information distributed
by, among others, Global Discovery, was in part to generate interest in investors buying
Halitron stock, right?

A:  Correct.

Q: Okay.  And you needed people to buy stock because those lenders had to sell
[their] discounted stock into the market to be made whole, right?

A:  Every public company needs investors buying stock, correct.

Q: Right.  And that would facilitate, in this case, those debt transactions that we
talked about, right?

A:  It would – it's a public company.  It needs investors to buy the stock.

Q: No market for the stock, those lenders aren't going to lend, are they?

A:  No.  You need an active stock market to receive debt financing as a public

company.

Trial Tr. at 179-180 (Findley).

In total, between May 2017 and April 2018, Halitron received $298,000 from debt financing transactions. Doc. No. 147, Ex. 1 (Noone declaration in support of Motion for Judgment). Findley then used this money largely for his own benefit or to perpetuate the fraud by paying for additional stock promotion activities. Trial Ex. 132 (debt financing funds flowing to Findley); Trial Tr. 637-638 (Noone); 70-71 (Findley).

William Donaldson loaned Halitron $75,000 of the total $298,000 in debt financing that Halitron obtained during the period of May 2017 to April 2018 by making three separate loans of $25,000 each on November 1, 2017, November 7, 2017, and November 30, 2017. *See* Plaintiff's Interrogatory Response No. 4, attached as Exhibit B to Defendants' Mem. of Law in Opp. to Plaintiff SEC's Motion for Final Judgment and Remedies. Doc. No. 148. William Donaldson's decision to loan Defendant Halitron money, including the $75,000 in November 2017, was not based on any public statements Defendant Findley made in Halitron press releases relating to the Financial Audit, Stock Buyback Program, or the $3 Million Promissory Note. *See* Declaration of William Donaldson, Doc No. 150, at ¶¶ 4-6.

D. Investors Were Harmed by Findley's Conduct

Throughout 2017 and 2018, investors complained about the dilution of their stock holdings caused by the undisclosed, massive share issuances, about the ineffectual and inconsequential stock buyback program, and about the long-promised financial audit never coming to fruition. Trial Exs. 619, 621, 622, 623, 631 ,632, 633, 636, 637. Findley acknowledged that he received 30 investor emails about the audit not being completed, as he had repeatedly promised would happen in Halitron's press releases. Trial Tr. 163:19-21. Those

investors complained after purchasing shares of Halitron stock on the hope that the representations Halitron and Findley had made via press release would materialize.  Trial Tr. 587:11-18; Trial Exs. 619, 621, 622, 623, 631, 632, 633, 636, 637.  But, unlike the debt financiers, ordinary investors lost money when billions of debt financiers' shares flooded the market, diluting the value of Halitron's stock.  Trial Tr. 100:4-103:10.

Gary Tas was one individual who bought Halitron stock in reliance on Findley's fraudulent statements.  Tas testified at trial that he read Halitron's press releases to learn about the company before investing and that he continued to follow the press releases after investing. Trial Tr. 587:11-18.  The information he found important included Halitron's purported $3 million note from LTCP (Trial Tr. 591:24-592:2), the stock buyback program (Trial Tr. 605:8-20), and the financial audit (Trial Tr. 593:19-594:1).  Tas also added to his Halitron stock holdings after speaking with Findley by phone about Halitron's prospects.  Trial Tr. 606:12-20 and 607:12-24; Trial Exs. 631 and 632.  But then Tas's investment went to "almost zero" as "the price [of Halitron shares] went way down in terms of 500 to 1,000 percent down" as a result of stock dilution.  Trial Tr. 595:14-19.  In total, Tas suffered a loss of 95% of his Halitron investment.  Trial Tr. 588:13-16 and Tr. 599:1-4.

Additional Halitron investors also suffered near total losses on their investments. For example, one investor complained to Findley that his shares lost more than 92% of their value. Trial Ex. 622.  Another investor emailed Findley that he had "organized a massive buy in" that ended with "losses or break even."  Trial Ex. 619.  Yet another investor accused Findley of "lur[ing] in investors to help pay off [Halitron's] massive debt," and warned him that the share price of Halitron will "continue to flounder."  Exhibit D (investor email).

An analysis by Nicolas Lopez, a member of the SEC's Division of Economic and Risk

Analysis, prepared for purposes of the Court's remedies analysis, further quantifies the degree

of investor harm.  Mr. Lopez analyzed trading data for the period May 12, 2017 to April 25,

2018 and concluded that at least 2,967 investors purchased Halitron shares during that period

and suffered trading losses of at least $1,688,548.  Lopez Decl, Doc. No. 161-5, at ¶ 6.

## II.    Legal Standards

The SEC seeks four categories of remedies against the defendants: (1) disgorgement by

both defendants on a joint and several basis, (2) civil penalties against Findley, (3) permanent

injunctions against both defendants, (4) officer and director, and penny stock bars against

Findley.

### A.  Disgorgement

Disgorgement is an equitable remedy, so district courts have broad discretion in

determining whether to order disgorgement, and if so the amount of disgorgement. "Once the

district court has found federal securities law violations, it has broad equitable power to fashion

appropriate remedies, including ordering that culpable defendants disgorge their profits." *Sec. &*

*Exch. Comm'n v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (internal quotation marks omitted).

Disgorgement "consists of factfinding by a district court to determine the amount of money

acquired through wrongdoing ... and an order compelling the wrongdoer to pay that amount plus

interest to the court." *Sec. & Exch. Comm'n v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006). To

determine the amount of disgorgement, courts apply a two-part burden shifting framework. *See*

*FTC v. Bronson Partners*, LLC, 654 F.3d 359, 368 (2d Cir. 2011). First, the agency seeking

disgorgement must "show that its calculations reasonably approximate[ ] the amount of the

defendant's unjust gains ." *Id.* at 368. Once the SEC has met that burden, defendants can attempt

to show that the SEC's calculation is inaccurate, or that some of the gains were not the result of

wrongdoing. *See Razmilovic*, 738 F.3d at 31. The Second Circuit explains that disgorgement "need only be a reasonable approximation of profits causally connected to the violation" and that "any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *Sec. & Exch. Comm'n. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (quoting *Sec. & Exch. Comm'n v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995)).

In addition, a district court may order a defendant to pay prejudgment interest to "prevent[ ][the] defendant from obtaining the benefit of what amounts to an interest free loan." *Sec. & Exch. Comm'n v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). Again, the Court has discretion to decide whether to award prejudgment interest, as well as in setting the appropriate interest rate. *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).

### B. Civil Penalty

Under Exchange Act Section 21(d)(3)(B)(iii) and Section 20(d) of the Securities Act, a court may order the defendant to pay a civil penalty in order to punish the defendant and deter future wrongdoing, because "disgorgement insufficiently deters securities laws violations." 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 77t(d); *Sec. & Exch. Comm'n v. Westport Cap. Markets, LLC*, 547 F. Supp. 3d 157, 172 (D. Conn. 2021) (internal citations omitted). Under both provisions, there are three tiers of penalties that may be imposed:

    i.    First Tier: the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.

    ii.    Second Tier: the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation. Requires that the defendant engaged in conduct that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."

     iii.    Third-tier: the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation. Requires the same showing as for a second tier penalty, plus "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."

*Id.* Civil penalties cannot be awarded on a joint and several basis.

### C. Permanent Injunction

A district court also has the authority to issue a temporary or permanent injunction to prevent future violations of the Securities and Exchange Acts. 15 U.S.C. §§ 78u(d) and 77t(b). In order for a permanent injunction to be awarded, "(t)he SEC must demonstrate that there is a substantial likelihood of future violation" of the securities laws. *Sec. & Exch. Comm'n v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). In determining whether to issue a permanent injunction, courts consider the following factors, commonly referred to as the "*Cavanagh* factors*"*:

[1] the fact that the defendant has been found liable for illegal conduct; [2] the degree of scienter involved; [3] whether the infraction is an "isolated occurrence;" [4] whether defendant continues to maintain that his past conduct was blameless; [5] and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Id.* Additionally, traditional equitable concerns are to be considered, and as such "the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion." *Sec. & Exch. Comm'n v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1102 (2d Cir. 1972).

### D. Industry Bars

Finally, Section 21(d)(2) of the Exchange Act and 20(e) of the Securities Act authorize district courts to bar a person who violated the securities laws from acting as an officer or director of an issuer of securities ("O&D bars"). 15 U.S.C. §§ 78u(d)(2), 77t(e). Section 21(d)(6)

of the Exchange Act and 20(g)(1) of the Securities Act authorize district courts to bar any person

who, at the time of the alleged misconduct was participating in an offering of penny stock,

permanently or temporarily from participating in an offering of penny stock ("penny stock bar").

*Id.* §§ 78u(d)(6), 77t(g)(1). In determining whether both O&D bars and penny stock bars are

appropriate, district courts commonly consider six factors laid out in *Sec. & Exch. Comm'n v.*

*Patel*: (1) the egregiousness of the defendant's securities laws violations; (2) whether the

defendant is a "repeat offender"; (3) the defendant's position in, or role with, the company when

he engaged in the fraud; (4) the degree of scienter involved; (5) the defendant's economic stake

in the violation; and (6) the likelihood of recurrence. 61 F.3d 137, 141 (2d Cir. 1995). *See also*

*Sec. & Exch. Comm'n v. Universal Exp., Inc.,* 475 F. Supp. 2d 412 (S.D.N.Y. 2007) ("The

standard for imposing [a penny stock] bar essentially mirrors that for imposing an officer-or-

director bar.").

### III.    Discussion

#### A.    Disgorgement

The SEC seeks an order requiring the defendants to disgorge $298,000, plus $91,735 in

prejudgment interest, for a total of $389,735. Mot. For Entry of Final Judgment, Doc. No 146, at

1. In *Liu v. Sec. & Exch. Comm'n*, the Supreme Court made clear that disgorgement is a form of

equitable relief that can be awarded under 15 U.S.C. § 78u(d)(5), which authorizes a court to

grant "any equitable relief that may be appropriate or necessary for the benefit of investors." 140

S. Ct. 1936 (2020). Therefore, the Court explained that disgorgement must awarded in

accordance with two competing principles of equitable relief: the need to avoid unjust

enrichment of wrongdoers on one hand, and the need to limit the amount of disgorgement to the

fair compensation of victims on the other. *Id.* at 1942. ("First, equity practice long authorized

courts to strip wrongdoers of their ill-gotten gains, with scholars and courts using various labels for the remedy. Second, to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims."). The Court went on to explain that the SEC had, in many cases, been "pushing the bounds of the equitable nature of the remedy" by ordering disgorged funds to be deposited in the Treasury rather than dispersed to victims. *Id.* at 1946. Additionally, in light of the language at the conclusion of Section 78u(d)(5) that equitable relief must be "appropriate or necessary for the benefit of investors", the Court explained that disgorgement "must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Id.* at 1948. However, the Court left open the possibility that, where it is infeasible to distribute collected funds to harmed investors, funds may instead be deposited into the Treasury. *Liu,* 140 S. Ct. at 1949 ("The parties do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles.").

Since the *Liu* decision, Congress amended the Exchange Act by adding Section 78u(d)(7), which specifically authorizes the SEC to seek disgorgement. 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."). Second Circuit caselaw makes clear that disgorgement under Section 78u(d)(7) must nonetheless continue to "comport with traditional equitable limitations as recognized in Liu" because the text of the amendment "evinces no intent to contradict *Liu* or to strip disgorgement of limit[s] established by longstanding principles of equity in favor of an unbounded 'legal' form of

disgorgement." *Sec. & Exch. Comm'n v. Ahmed*, 72 F.4th 379, 396, 398 (2d Cir. 2023). One of those traditional equitable limitations that continues to be relevant to disgorgement is that disgorgement must be "awarded for victims." *See Sec. & Exch. Comm'n v. Govil*, 86 F.4th 89, 93-94 (2d Cir. 2023) ("One of the equitable limitations identified in *Liu* is that disgorgement must be 'awarded for victims.' Because a defrauded investor is not a 'victim' for equitable purposes if he suffered no pecuniary harm, the district court needed to determine that the investors Govil defrauded suffered pecuniary harm before awarding disgorgement.").

At the October 11, 2023 hearing on the SEC's motion for judgment and in their briefing in opposition to that motion, the defendants argued at length that disgorgement was not appropriate in this case because the SEC was not planning to pay disgorged funds directly to harmed investors, and therefore had not demonstrated that disgorgement would be "awarded to victims." Hrg. Tr. 23:22-29:6; Defense Mem. in Opp., Doc. No. 148, at 17-19. At the time, the SEC's position was that a distribution of disgorged funds to harmed investors was not feasible. Hrg. Tr. 33:21-34:3. However, following that hearing, the SEC notified the Court that it had reconsidered and determined that it *is* feasible to distribute disgorged funds to Halitron investors who suffered trading losses during the period of the defendants' misconduct. *See* Notice Regarding Distribution Feasibility, Doc. No. 162. Therefore, the defendants' argument is moot, and I need not decide the open question whether, after *Liu*, disgorgement may be awarded when the funds will be deposited in the Treasury.

Balancing the interests of preventing unjust enrichment and limiting disgorgement to the harm suffered by victims, it is clear that disgorgement is appropriate. The defendants' misconduct was designed to, and did, attract debt financing to the company, and ordering the defendants to disgorge those ill-gotten gains serves the equitable purpose of avoiding unjust

enrichment. *See supra* Section I(C). Investors who purchased Halitron stock during the time period in which the defendants were making false statements suffered estimated trading losses of at least $1,688,548. Lopez Decl, Doc. No. 161-5, at ¶6. Therefore, an award of even the maximum amount of disgorgement sought by the SEC, in the amount of $298,000 cannot be said to have "transform[ed] an equitable remedy into a punitive sanction," because it represents an attempt to recover an amount of profits that the defendants unjustly obtained, and does not exceed the losses suffered by victims of the defendants' wrongful conduct. *Liu*, 140 S. Ct. at 1943.

Having concluded that an award of disgorgement in this case is consistent with the equitable nature of that remedy, I turn to the requirement that the amount of disgorgement be a "reasonable approximation of profits" caused by the wrongdoer's violation of the law. *Sec. & Exch. Comm'n v. First Jersey Sec., Inc*., 101 F.3d 1450, 1475 (2d Cir. 1996). The SEC's calculation of disgorgement, $298,000, is the total sum of money received by the defendants from debt financing transactions between May 2017 and April 2018. Noone Decl., Doc. No 147-1, at ¶ 7. First, focusing on the proceeds of debt financing transactions during that specific time period is appropriate because, consistent with the jury's verdict and my own findings of fact based on the evidence presented at trial, May 12, 2017 to April 25, 2018 is the time period from the first to the last of the defendants' fraudulent statements. *See supra* Section I(B).

However, not all of the debt financing received by the defendants during this time period can automatically be disgorged without determining that there is a causal connection between the financing transactions and the defendants' wrongful conduct. *Sec. & Exch. Comm'n. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) ("[I]n order to establish a proper disgorgement amount, the party seeking disgorgement must distinguish between the legally and illegally

derived profits."). Findley admitted at trial that the fraudulent press releases were designed to increase Halitron's stock price in order to facilitate debt financing transactions. Trial Tr. 179:16-180:9. Therefore, it is a perfectly reasonable inference that the debt financing funds received by the defendants during the relevant time period were causally connected to those fraudulent statements. Contrary to the defendants' characterization, *see* doc. no. 148, at 16 n. 5, that inference does not transform the calculation of disgorgement into a "total profits" calculation, which would be applicable only to "scheme to defraud" cases, and not "false statement" cases like this one. The disgorgement amount that the SEC seeks here, in contrast to cases adopting a "total profits" approach, is limited to identifiable sources closely tied to the specific false statements made by the defendants. *Cf. Sec. & Exch. Comm'n v. Boock,* 2011 WL 13334102, at *9 (S.D.N.Y. May 10, 2011) (denying the SEC's request for disgorgement of all deposits into the defendant's checking account during the period in which he was found to have been engaging in fraudulent conduct). Therefore, especially in light of the Second Circuit's instructions that "the risk of uncertainty in calculating disgorgement should fall on the wrongdoer," *First Jersey*, 101 F.3d at 1475, and that "because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude," *Razmilovic*, 738 F. 3d at 31, I conclude that the SEC has met its burden to establish that its calculation of disgorgement reasonably approximates the amount of the defendants' unjust gains.

The defendants have shown, however, that some of the gains included in the SEC's calculation were not the result of wrongdoing. *Id.* ("Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains were unaffected by his offenses.") (internal citations

omitted). In particular, one individual who provided debt financing to the defendants during the period of May 2017 to April 2018 was William Donaldson, who submitted a declaration that his decision to do so was on the basis of favorable loan terms and a prior existing business relationship, and not based on any press releases made by the defendants. Declaration of William Donaldson, Doc No. 150, at ¶¶ 4-6. During the pertinent time period, the amount of funding provided by Mr. Donaldson was $75,000. Doc. No. 148-2. Relying on Donaldson's signed declaration and the explanations given therein, and even after heeding the SEC's warning that the declaration should be "viewed with skepticism" because of Donaldson's potential interest in the outcome of this litigation, *see* doc. no. 152, at 5 n.1, I find that the defendants have met their burden to show that the funding received from Donaldson was not connected to the fraudulent public statements. Therefore, $75,000 will be subtracted from the disgorgement amount proposed by the SEC, yielding a final disgorgement amount of **$223,000.**

In addition to disgorgement, the SEC seeks an award of prejudgment interest on any disgorgement amount, using the IRS rate for tax underpayment to calculate that interest. An award of prejudgment interest is appropriate, to ensure that the defendants do not continue to enjoy the benefits of "what amount[s] to an interest free loan procured as the result of illegal activity." *Sec. & Exch. Comm'n v. Moran,* 944 F. Supp. 286, 295 (S.D.N.Y 1996). *See also Sec. & Exch. Comm'n v. First Jersey*, 101 F.3d 1450, 1475-76 (3d Cir. 1996) ("Generally, prejudgment interest is calculated at the IRS underpayment rate because that rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud."). The SEC is therefore directed to submit a new calculation of prejudgment interest, using the IRS underpayment rate and based on a disgorgement amount of $223,000, to the Court for approval.

Finally, disgorgement is ordered on a joint and several basis against both defendants Findley and Halitron. Findley was the sole officer and director of Halitron at the time the fraudulent statements were made and therefore directly profited from the misconduct. *See First Jersey*, 101 F.3d at 1475 ("([W]here a firm has received gains through its unlawful conduct, [and] where its owner and chief executive officer has collaborated in that conduct and has profited from the violations . . . it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order.").

B. <u>Civil Penalty</u>

The SEC seeks a $446,458 civil penalty against Mr. Findley, which represents two third-tier penalties in the amount authorized against individuals, one for each statutory violation Findley was found liable for, adjusted for inflation. The defendants argue that this amount of civil penalty is inappropriate for two reasons: first, because the evidence does not support a third-tier penalty because Mr. Findley's misconduct did not result in substantial losses to investors, and second, because the factors laid out in *Sec. & Exch. Comm'n v. Haligianis* counsel in favor of imposing less than the maximum civil penalty. 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007). *See also Sec. & Exch. Comm'n v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) ("The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court.").

First, the Defendants argue that the SEC has not proven that any individual investors actually suffered substantial losses as a result of the Defendants' actions, either by pointing out that the SEC has not tied individual investors' losses to directly to the fraudulent press releases, or by arguing that investors' losses were not "substantial." Doc. No. 148, at 20-22. But, even setting aside the question whether the losses in this case were "substantial," which they appear to

have been, the imposition of a third-tier penalty only requires that a defendant's conduct create a significant *risk* of substantial losses. *See Sec. & Exch. Comm'n v. Lemelson,* 596 F. Supp. 3d 227, 235 (D. Mass. 2022) ("[A] significant risk of substantial loss is enough to qualify a violation for Tier III penalties."); *Sec. & Exch. Comm'n v. SeeThruEquity, LLC*, 2022 WL 171196 at *2 (S.D.N.Y. Jan. 19, 2022) (applying a third-tier penalty because the defendant disseminated false information to investors, resulting in a "significant risk of substantial loss to the investing public."). Testimony was presented at trial that the defendants made false statements in order to artificially prop up Halitron's stock price and to attract investors, all while the company was engaging in little to no actual business activity and in fact issuing additional shares that diluted its stock value. *See supra* Section I(B). Two third-tier penalties are appropriate here, given the significant risk that the Defendant's false statements, both about the financial audit and about the stock buyback program, would result in substantial losses to investors.

Next, I must also consider the *Haligiannis* factors to determine the appropriate amount of the civil penalty to impose. Those factors are:

> (1) the egregiousness of the violations at issue; (2) defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*Sec. & Exch. Comm'n v. Haligiannis,* 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007). *See also Sec. & Exch. Comm'n v. Rajaratnam,* 918 F.3d 36 (2d Cir. 2019). The Defendants argue that only a $50,000 to $75,000 penalty should be awarded because Mr. Findley's actions were not egregious or recurrent, the jury found him to have acted with scienter only with respect to some of the statements and with negligence with respect to others, his actions did not result in substantial losses, he accepts responsibility, and finally because he does not have the ability to pay a

maximum penalty. Doc. No. 148 at 23-26; Findley Decl., Doc. No. 149. Most of those arguments are unconvincing. The evidence at trial and the jury's verdict supports findings that, over the course of a year, Mr. Findley knowingly made false statements about three separate topics in order to encourage investment in Halitron, money thats he used for his own enrichment and not to increase shareholder value. *See supra* Section I(A)-(B).

Findley's financial status, however, warrants reduction from the maximum permissible civil penalty. He declares that he has virtually no assets (for instance, he rents his home) or cash, significant consumer, business, and legal debts, and a $250,000 annual salary. Findley Decl., Doc. No. 149, at ¶¶ 6-12; Statement of Financial Conditions, Doc. No 160-1. Though this salary is relatively high, his financial situation does seem to indicate that he would be unable to pay a very high civil penalty, especially in light of the other penalties imposed against him. *See, e.g., Sec. & Exch. Comm'n v. Westport Cap. Markets, LLC*, 547 F. Supp. 3d 157, 173-74 (D. Conn. 2021) (lowering slightly the amount of civil penalties that were asked for, from $225,000 to $200,000, for the individual defendant on account of his "significantly weakened financial position" despite his ongoing "significant income" and earning potential). Therefore, though mindful that civil penalties *are* intended to be punitive, on account of Findley's financial condition I order that Findley pay a civil penalty in the amount of **$250,000**.

## C. Permanent Injunction

Applying the *Cavanagh* factors to the facts established in this case, I conclude that a permanent injunction restraining and enjoining the defendants from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder is warranted because the SEC has established that there is a substantial likelihood that the defendants will violate federal securities laws in the future. The only *Cavanagh* factor weighing against

enjoining the defendants from violating securities laws is the fourth: Findley has acknowledged

his wrongdoing and accepted responsibility for his actions. Findley Decl., Doc. No. 149. On the

other hand, the first three *Cavanagh* factors point clearly in favor of a permanent injunction. The

defendants were found liable for engaging in illegal conduct, the jury found that they acted with

scienter with respect to the statements about the financial audit and stock buyback programs,[2]

and the conduct was not an "isolated occurrence," but consisted of multiple false statements over

the course of about a year that were designed to generate income for the defendants and that

harmed investors. *See supra* Section I(A)-(B).

The fifth *Cavanagh* factor also points in favor of a permanent injunction. Halitron is still

a publicly traded company and Findley is still the sole officer and director, putting both in the

position to commit future violations. *See* Statement of Undisputed Facts, Doc. No. 106-1, at ¶ 4.

The defendants argue that a permanent injunction will harm them because it will qualify Halitron

as a "Bad Actor" under Regulation D of the Securities Act, putting it at a disadvantage compared

to other small public companies when raising funding. Doc. No. 148, at 27-28. Though I may

consider this potential adverse effect on the defendants when determining whether an injunction

is warranted and for how long it should be in effect, that assertion is also evidence of Findley's

intent to continue operating Halitron as a public company, putting the defendants in a position

where future violations could be committed.

Finally, though mindful of the stigma that an injunction places on the defendants in the

industry, a permanent injunction also serves the important function of protecting potential future

investors, a function I may also consider in exercising my discretion. *See Sec. & Exch. Comm'n*

---

[2] The fact that Findley ignored the advice of counsel when issuing the stock buyback press
releases also suggests that he acted with a high degree of scienter. *See* Trial Ex. 597, at 1.

*v. Culpepper,* 270 F.2d 241, 250 (2d Cir. 1959) ("In the formulation of its discretion [the district court] should recognize that the public interest, when in conflict with private interest, is paramount."). And, importantly, the nature of the injunction sought by the SEC merely requires the defendants to fulfil their existing obligations not to violate the law. Therefore, a permanent injunction against future violations of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act is warranted in this case.

D. <u>Industry Bars</u>

Finally, I find that four-year industry bars, preventing Findley from serving as an officer and director of any public company and from offering penny stocks for a period of four years, are appropriate in this case because Findley's conduct demonstrates his unfitness to serve as an officer or director of a public company. *See* 15 U.S.C. § 78u(d)(2) (authorizing a court to issue an officer and director bar "if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer."). As an initial matter, a penny stock bar is also appropriate because there is no dispute that Halitron is a penny stock and therefore that Findley, as the sole officer and director of Halitron, participated in the offering of a penny stock. *See* 15 U.S.C. § 78u(d)(6) ("In any proceeding . . . against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock. . . ."). Additionally, most of the *Patel* factors, which I must consider when determining whether to impose O&D and penny stock bars against Findley, overlap with those discussed previously. The third, fourth, fifth, and sixth *Patel* factors, for example, direct me to consider Findley's role with the company when he engaged in fraud, his degree of scienter, his economic stake in the violation, and the likelihood of

recurrence. As I explained above when discussing the appropriateness of injunctive relief, those factors also weigh in favor of the imposition of industry bars.

However, I must also consider the egregiousness of Findley's conduct and whether he is a repeat offender. While certainly carried out with scienter and with the purpose of enriching himself, compared to other cases in which permanent industry bars were imposed, Findley's conduct may be considered somewhat less egregious. *See, e.g. Sec. & Exch. Comm'n v. Westport,* 547 F. Supp. 3d at 173 (defendants' actions were egregious because they amounted to thousands of fraudulent transactions over the course of several years, earning defendants hundreds of thousands of dollars); *Sec. & Exch. Comm'n v. Becker*, 2010 WL 2710613 (S.D.N.Y. July 8, 2010) (authorizing a permanent penny stock bar against defendants who had fraudulently sold unregistered securities to at least 29 investors over the course of six years, raising approximately $1.3 million). In addition, Findley is not a repeat offender. *See* Findley Suppl. Decl., Doc. No. 160, at ¶ 3. Therefore, after weighing the various relevant factors, I conclude that temporary, rather than permanent, industry bars are appropriate. *See Patel*, 61 F.3d at 142 ("[B]efore imposing a permanent bar, the court should consider whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient, especially where there is no prior history of unfitness.").

## IV.    Conclusion

For the foregoing reasons, I order the following relief:

a)   Disgorgement in the amount of $223,000 on a joint and several basis against the defendants,

b)   A civil penalty against Findley in the amount of $250,000,

c)   An injunction permanently restraining and enjoining the defendants from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as set forth below,

d)   A four-year officer and director bar against Findley,

e)   A four-year penny stock bar against Findley.

The SEC is directed to submit to the Court a proposed calculation of prejudgment interest on the disgorgement amount to be paid by the defendants. Thereafter, judgment shall enter.

## PERMANENT INJUNCTION ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED**, pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, that:

(a)   Bernard Findley, Halitron, Inc., and their agents, servants, employees, attorneys, successors or assigns, and those persons in active concert or participation with them who receive actual notice of this Order, are permanently restrained and enjoined from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Specifically, the enjoined parties are barred, in the purchase, offer, or sale of any security by the use of any means or instruments of communication in interstate commerce or by the use of the mails, from:

1.   employing any device, scheme, or artifice to defraud;

2.   obtaining money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3.  engaging in any transaction, practice, or course of business which operates or
    would operate as a fraud or deceit upon the purchaser.


So ordered.

Dated at Bridgeport, Connecticut, this 21st day of February 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge